CARGILL, INCORPORATED[1] vs. BEAVER COAL & OIL CO., INC.,
& others.[2]

Norfolk. November 6, 1996. - March 5, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & MARSHALL, JJ.

*Practice, Civil,* Summary judgment, Attorney's fees, Interest. *Corporation,*
Corporate successor liability, Merger.

In a civil action the judge did not err in holding the defendant liable for a
preexisting debt to the plaintiff on a theory of successor corporate li-
ability based on the doctrine of de facto merger, in circumstances in
which, following the defendant's purchase of all the debtor's assets, the
defendant conducted the business in the same fashion as the debtor;
there was shareholder continuity between the debtor and the defendant;
the debtor ceased all operations; and the defendant assumed the obliga-
tions of the debtor necessary to continue the business. [359-362]
In a civil action, there was no error in the judge's calculation of an award
of attorney's fees to the plaintiff [362-363] and the judge correctly awarded
interest pursuant to the rate set forth in G. L. c. 231, § 6C, from the
date of the commencement of the action [363-364].

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 31, 1990.

The case was heard by *Patrick F. Brady,* J., on motions for
summary judgment; a motion for assessment of attorney's
fees was heard by *Thomas E. Connolly,* J., and entry of a final
judgment was ordered by him.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Alan B. Almeida* for the defendants.
*Andrew M. Osborne* for the plaintiff.

MARSHALL, J. Cargill, Incorporated, doing business as
Northeast Petroleum (Northeast), a wholesale supplier of liq-

_____

[1]Doing business as Northeast Petroleum.

[2]Citizens Fuels Corporation; Michael Viano, individually and as trustee
of February Realty Trust, Eastside Realty Trust, MMJ Realty Trust, and
Jorie Lane Realty Trust; and Geraldine G. Viano. See note 4, *infra.*

uid petroleum products, commenced this action against Beaver Coal & Oil Co., Inc. (Beaver), a retail seller of home heating oil and related products, and Citizens Fuels Corporation (Citizens) to collect payment for home heating oil that Northeast had sold to Beaver. Before it paid Northeast for the oil deliveries, Beaver sold substantially all of its assets and business to Citizens. When it was unable to secure payment, Northeast commenced this action alleging that Citizens was liable to Northeast on a theory of corporate successor liability. Northeast also alleged that the transfer of assets from Beaver to Citizens constituted a "bulk transfer" as defined by the Bulk Transfers Act, G. L. c. 106, §§ 6-101 et seq. (act), and that Citizens had failed to give proper notice to Beaver's creditors, as required by G. L. c. 106, §§ 6-105 and 6-106.

On cross motions for summary judgment by Northeast and Citizens, a judge of the Superior Court ruled that there was a de facto merger of Citizens and Beaver, and that Citizens was liable to Northeast as the successor corporation to Beaver. He also ruled that Citizens had failed to comply with the notice provisions of the Bulk Transfers Act.[3] Another judge of the Superior Court ruled on Northeast's motion for assessment of attorney's fees and entered final judgment against Citizens in the amount of $254,660.75, the amount owed by Beaver to Northeast, with interest at the statutory rate from January 31, 1990, attorney's fees of $47,696.50, and costs.[4]

Citizens appealed and Northeast cross-appealed, the latter challenging the adequacy of the interest and attorney's fees awarded. We transferred the appeals to this court on our own motion. We agree that Citizens is the corporate successor of Beaver and is liable to Northeast for the full amount of Beaver's indebtedness. We need not, therefore, pass on the judge's rulings concerning the Bulk Transfers Act. We also

[3] In a separate action brought by another creditor of Beaver, the Appeals Court affirmed a judgment of the Superior Court that the sale of Beaver's assets to Citizens violated the Bulk Transfers Act. See *Coastal Oil New England, Inc.* v. *Citizens Fuels Corp.*, 38 Mass. App. Ct. 26 (1995). The plaintiff in that case did not allege that Citizens was the successor corporation to Beaver, and that issue was not addressed.

[4] Judgment in the same amount also was entered against Beaver and against Michael Viano in the amount of $70,000, as trustee. Neither Beaver nor Viano appealed. A voluntary dismissal was entered against Geraldine G. Viano, and a dismissal was entered as to Michael Viano, individually, by reason of his discharge in bankruptcy.

affirm the award of attorney's fees and the calculation of interest.

## I

The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). See *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 539 (1995), and cases cited. We review the facts under that standard.

Beaver was a full-service retail oil dealer that sold home heating oil to homeowners and other petroleum products to commercial and wholesale accounts. Beaver also sold and serviced air conditioning and oil-fired heating systems.

On August 1, 1989, after many months of negotiations, Beaver and Citizens entered into a sale of assets agreement (transaction), pursuant to which Citizens acquired substantially all Beaver's assets, including its inventory of parts and equipment.[5] Citizens paid Beaver $1,105,393.71 in the form of cash, a promissory note, and the assumption of certain debts.[6]

For several years prior to the transaction Northeast had done business with Beaver. They apparently had a satisfactory relationship, and Northeast had provided Beaver with a substantial line of credit. In the heating season immediately prior to the transaction, Northeast sold more than $250,000 of home heating oil to Beaver. However, during the spring and summer of 1989, as Beaver negotiated with Citizens about the sale of its business, Beaver fell behind in its payments to Northeast. Northeast's credit manager became concerned about the debt and had repeated conversations with Beaver about it.

[5]The assets sold to Citizens included customer lists; customer contracts; furniture, fixtures and furnishings; service parts, equipment, and service supplies; trademarks; trade names; service marks; licenses and logos; contracts; agreements and leases; automotive equipment and motor vehicles; leasehold interest; goodwill; and certain prepaid expenses and all business and other books, papers, files, and records, with certain exceptions.

[6]These debts included obligations under various contracts, agreements, commitments and leases, oil delivery and service contract obligations to Beaver customers, and unpaid employee vacation time. They did not include the debt of Beaver to Northeast.

Northeast learned about the possible sale of Beaver to Citizens in the late spring of 1989, and was told that there should be more than sufficient funds from the sale proceeds to retire Beaver's indebtedness to Northeast. However, on August 1, 1989, the date on which the transaction was consummated, Northeast learned for the first time that there were insufficient funds to pay all creditors and that Beaver intended to make no payments at all to Northeast from the sale proceeds. The sale of Beaver's business to Citizens was consummated, and Northeast was paid nothing.

Following the transaction Citizens continued to conduct the business much as Beaver had, using Beaver's name, Beaver's offices, and its equipment. All Beaver's employees became employees of Citizens, carrying out their same duties, and serving Beaver's customers. In the months that followed, Citizens agreed to and did pay some of Beaver's creditors, but it made no payments to Northeast. Unable to secure payment from any source, Northeast commenced this action in January, 1990.

## II

We consider first Northeast's claim that Citizens is the successor corporation to Beaver. Citizens argues that the judge erred in holding it liable for Beaver's preexisting debt on a theory of successor corporate liability based on the de facto merger doctrine. We conclude that the judge was correct, even as we recognize the importance of respecting separate corporate entities. We adhere to traditional corporate law principles that the liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor. *Guzman* v. *MRM/Elgin*, 409 Mass. 563, 566 (1991). See *McCarthy* v. *Litton Indus., Inc.*, 410 Mass. 15, 21 (1991); *Dayton* v. *Peck, Stow & Wilcox Co. (Pexto)*, 739 F.2d 690, 692 (1st Cir. 1984) (construing Massachusetts law); 15 W. Fletcher, Private Corporations § 7122, at 231 (rev. perm. ed. 1990).

The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are

whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1010, 1015 (D. Mass. 1989). See also 15 W. Fletcher, *supra* at § 7124.20, at 294. No single factor is necessary or sufficient to establish a de facto merger. *Id.* We agree with the judge that each factor is satisfied in this case.

First, it is not disputed that following the transaction Citizens conducted the business in substantially the same fashion as Beaver, using the Beaver name (as Citizens had acquired the right to do), from the same locations, with the same employees and operational management. In determining whether a de facto merger has occurred, courts pay particular attention to the continuation of management, officers, directors and shareholders. See, e.g., *Dayton* v. *Peck, Stow & Wilcox Co. (Pexto)*, *supra* at 693. Here, the general manager of Beaver, a key employee in charge of all Beaver's operations, retained the same position with Citizens as he had with Beaver. He testified that his duties at Citizens were exactly the same as his duties at Beaver. He also testified that all the employees of Beaver became employees of Citizens with, but one exception, all maintaining their same positions and responsibilities.[7] In short, the business of Citizens was conducted by exactly the same people as the business of Beaver. In addition Michael Viano, the sole shareholder, officer and director of Beaver, became a director and a shareholder of Citizens.

[7]The sole exception was Gabin Viano, the sales manager of Beaver, who became the operations manager of Citizens. Citizens had no sales manager; those responsibilities were assumed by the general manager.

Citizens used the same telephone numbers as Beaver, the same trucks, and the same equipment. Beaver's customer lists and contracts were transferred to Citizens, all whom were serviced just as they had been by Beaver. As the judge found, Citizens simply became Beaver. See *Cyr* v. *B. Offen & Co.,* 501 F.2d 1145, 1153 (1st Cir. 1974).

As to the second factor, this was not a typical shares-for-assets transaction, and we recognize that this factor is most frequently applied when the purchaser corporation exchanges its own stock as consideration for the seller corporation's assets. See *Acushnet River, supra* at 1014, and cases cited.[8] In this case Michael Viano acquired a twelve and one-half per cent shareholder interest in Citizens[9] ; he also became a director of Citizens. It also appears that his shares may have been paid for with the sale proceeds. While this does not constitute shareholder continuity in its fullest sense, there is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach. See *Cyr* v. *B. Offen & Co., supra* at 1154.

The third factor is also satisfied. Under the terms of the sales agreement Beaver was required to, and did, cease all its operations. While the corporate entity was not dissolved, that does not preclude a finding of de facto merger. It is not disputed that after the transaction Beaver did not perform any further operations; its entire operational business was assumed by Citizens. For all practical purposes Beaver ceased to exist. While formal dissolution of the corporate entity is one aspect to consider, the requirements of the third factor are met because Beaver effectively ceased its ordinary business operations and liquidated its assets.[10] See *Knapp* v. *North Am. Rockwell Corp.,* 506 F.2d 361, 365 (3d Cir. 1974), cert. denied, 421 U.S. 965 (1975).

---

[8]Where no stock is exchanged, corporate successor liability has more frequently been imposed on a theory of "continuity of enterprise." See, e.g., *Turner* v. *Bituminous Cas. Co.,* 397 Mich. 406, 406, 411 (1976). There is no claim here by Northeast that we should apply that theory of liability and we do not do so.

[9]The stockholders in Citizens immediately after the sales were Viano (twelve and one-half shares), Michael G. Saegh (thirteen shares) and the corporation itself (seventy-four and one-half shares).

[10]In *McCarthy* v. *Litton Indus.,* 410 Mass. 15, 23 (1991), in the context of a claim that the defendant corporation was a "mere continuation" of its predecessor, we said that one indicia of continuation is the "continued existence of only one corporation after the sale of assets." There the predeces-

Finally, as the trial judge found, Citizens assumed those obligations of Beaver necessary for the uninterrupted continuation of normal business operations. Beaver and Citizens agreed to pay certain creditors of Beaver, with preference given to creditors that continued to do business with Citizens. Citizens also assumed all executory contracts to install heating equipment for customers, and it assumed service contracts and the obligation to deliver oil to customers with credit balances.

Citizens held itself out to the world as the same enterprise as Beaver, apparently not notifying its customers of any change in ownership. It continued to function in the same manner with the same employees, delivering the same product, and providing the same services as Beaver. Citizens argues that the public policy concerns such as tort liability or compliance with environmental laws that have impelled a finding of successor liability in other cases are not present in this case. We consider the fair remuneration of corporate creditors a policy worthy of advancement.

We recognize that there is often a tension between this goal and our strong interest in respecting corporate structures. Each case must be decided on its specific facts and circumstances. Where, as here, the acquiring enterprise assumed all the benefits of and held itself out to the world as the same enterprise as its predecessor, we conclude that the tension must be resolved in favor of an innocent creditor. On these facts we conclude that Citizens is the corporate successor to Beaver, and is liable to Northeast for Beaver's preexisting debt to it.

## III

For its part, Northeast argues that the judge erred in his calculation of the attorney's fees awarded to it.[11] It claims

sor corporation had spawned two separate entities, one of which had continued to manufacture one line of products. Here Beaver ceased all operational activities.

[11]Northeast does not explain on what basis it sought attorney's fees, nor is the reason apparent from the record. We observe that Northeast filed a motion for assessment of attorney's fees, "sought in the original and amended complaints," but neither document provides any such explanation. No opposition to the motion was filed by Citizens and, according to Northeast, at the hearing on the motion Citizens informed the court that it

that the judge below considered only the "lodestar" amount when he should have considered other factors as described in *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 569 (1933).[12] When attorney's fees are awarded, the amount is in the discretion of the trial judge, *McGrath* v. *Mishara*, 386 Mass. 74, 87 (1982), and we shall reverse the decision only if it is clearly erroneous. *Kennedy* v. *Kennedy*, 400 Mass. 272, 274 (1987), citing *Mahoney* v. *Gallagher*, 11 Mass. App. Ct. 1038 (1981). We have reviewed the submissions to the trial judge and conclude that the award of attorney's fees was not clearly erroneous.

Northeast also appeals from the decision of the judge applying the statutory interest rate from the date the action was commenced on January 31, 1990, rather than the interest that Northeast sought, one and one-half per cent each month from December 31, 1989. General Laws c. 231, § 6C, provides that in contract actions "interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand." Northeast bases its claim entirely on an agreement and order for entry of partial judgment (agreement) executed by Beaver and Northeast during the course of this litigation and approved by the court below on October 10, 1990. That agreement provides that interest would be calculated at the rate of one and one-half per cent per month from December 31, 1989.

Northeast claims that the agreement constitutes a contract which can be enforced against Citizens. Citizens replies that it was not a party to the agreement, even though it assented to it. We conclude that Northeast's claims reach too far. We look to the contract claim asserted by Northeast when it

did not oppose an award of attorney's fees based on the "lodestar" method. Citizens does not contest Northeast's representation. Moreover, on appeal Citizens does not challenge an award of attorney's fees, arguing only that the amount awarded by the judge is not clearly erroneous. For those reasons we will not upset the award of attorney's fees.

[12]Those factors include (1) the ability and reputation of the attorney, (2) the demand for attorneys' services by others, (3) the amount and import of the matter involved, (4) the time spent, (5) the prices usually charged for similar services by other attorneys in the area, (6) the amount of money affected by the controversy, and (7) the results. *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 569 (1933).

commenced its action against Beaver and Citizens. While both the complaint and the first amended complaint make a demand for interest at the rate of one and one-half per cent a month from December 31, 1989, we are unable to discern from the allegations the basis on which Northeast relies for that claim; certainly Northeast did not identify any specific contract terms on which it relied. Northeast's agreement with Beaver was executed during this litigation and to resolve its claims against Beaver. The agreement is not enforceable against Citizens. We conclude that the judge was correct in determining that the statutory rate should be imposed from the date of the commencement of the action, January 31, 1990.

The judgment on count IV of the amended complaint is affirmed.

*So ordered.*