van Gestel, Allan, J.
This matter is before the Court after a jury-waived trial on the merits. The Court’s findings of fact, rulings of law and an order for judgment follow below. What is involved in the underlying case is the interpretation and application of a contract between the plaintiff, Josephine Hoppe (“Hoppe”), and the defendant, CMGI, Inc. (“CMGI”).
The complaint is in two counts: Count I for breach of contract, and Count II for breach of the implied covenant of good faith and fair dealing.

FINDINGS OF FACT

From October 1999 until April 30, 2003, Hoppe was CMGI’s Chief Information Officer (“CIO”). She was a highly compensated senior executive. On October 25, 2001, Hoppe and CMGI entered into an Executive Retention Agreement (the “Agreement”). Other CMGI executives were offered similar retention/severance agreements as inducements to stay on at CMGI in light of substantial uncertainty that then existed at the company. CMGI was going through a major restructuring of its business, following the burst of the “Internet bubble” and the dramatic drop in stock value for companies involved in that industry.
In essence, the Agreement provides that if Hoppe’s employment terminated for reasons other than cause, she is eligible to receive certain benefits. The level of benefits depends upon whether her termination followed a “Change in Control” or was absent a change in control but nevertheless without cause. The Agreement provides in Section 2 as follows:
(a) Severance Pay Following a Change in Control In the event a Change in Control (as defined below) occurs and, within one (1) year thereafter, the employment of the Executive is terminated by the Company for a reason other than Cause . . . then the Company shall pay to the Executive (as severance pay) a lump sum payment equal to her then current base salary multiplied by two (2) . . . (and] ... an amount equal to the Bonus [as defined and to be calculated as set forth in the Agreement], [as well as accelerated stock option vesting] . . . The Executive agrees that after the Termination Date, but prior to payment of the severance pay and acceleration of stock options called for by this paragraph, she shall execute a release, based on the Company’s standard form severance agreement, of any and all claims she may have against the Company and its officers, employees, directors, parents and affiliates. Executive understands and agrees that the payment of the severance pay called for by this paragraph are [sic] contingent on her execution of the previously described release of claims.
(b) Severance Pay Absent a Change in Control. In the event the employment of the Executive is terminated by the Company for a reason other than for *208 Cause (as defined below), then the Company shall continue to pay the Executive (as severance pay), her regular semi-monthly base salary as in effect on the Executive’s last day of employment ... for one (1) year following the Termination Date ... The Executive agrees that after the Termination Date, but prior to payment of the severance pay called for by this paragraph, she shall execute a release, based on the Company’s standard form severance agreement, of any and all claims she may have against the Company and its officers, employees, directors, parents and affiliates. Executive understands and agrees that the payment of the severance pay called for by this paragraph are [sic] contingent on her execution of the previously described release of claims.
“Change in Control” is defined in Section 3(d) of the Agreement as
. . . the consummation of any of the following during the Employment Period: (i) a sale, lease or disposition of all or substantially all of the assets of the Company, or (ii) a sale, merger, consolidation, reorganization, recapitalization, sale of assets, stock purchase, contribution or other similar transaction (in a single transaction or a series of related transactions) of the Company with or into any other corporation or corporations or other entily, or any other corporate reorganization, where the stockholders of the Company immediately prior to such event do not retain (in substantially the same percentages) beneficial ownership, directly or indirectly, of more than fifty percent (50%) of the voting power of and interest in the successor entity . . .
The Agreement is governed by and to be construed in accordance with the laws of the Commonwealth.
On April 30, 2003, Hoppe’s employment with CMGI was terminated for reasons other than cause. At that time CMGI offered to Hoppe one year of salary, a pro-rated bonus and other benefits to which she was entitled under Section 2(b) of the Agreement, provided that she execute CMGI’s standard form release.
On June 16, 2003, Hoppe executed the standard form severance agreement and general release. Then, on June 23, 2003, she revoked the release — as was her right. These actions were pursued by Hoppe with the advice of counsel. Hoppe now seeks recovery under Section 2(a), claiming a “Change in Control” as defined in Section 3(d) (i) of the Agreement.
CMGI was formed in 1986 as CMG Information Services, Inc., through the acquisition of College Marketing Group, Inc., a company that had been in operation since 1968.
CMGI has been a publicly traded Delaware corporation since 1994. As a company, CMGI has changed dramatically over the years. It has acquired, invested in, sold its interests in, and discontinued a large number of companies. It is perhaps best known for its direct acquisitions or investments in numerous companies or businesses during the “Internet boom” and the resulting market declines as the Internet bubble burst.
At least until 2002, CMGI touted itself as a leading Internet operating and development company. Even in its 2002 Annual Report, CMGI stated: “Unlike many of its peers in the Internet-centric enclave of the technology sector, CMGI has survived and adjusted
From its inception in 1986, CMGI has had a subsidiary called SalesLink Corp. (“SalesLink”), which is in the supply chain management business. SalesLink provides inventory management, supply chain, warehousing and fulfillment services at a number of facilities throughout the world. These services assist in the delivery of goods from the manufacturer to the customer. The business of SalesLink is different from the business of most other subsidiaries of CMGI.
As a result of the bursting of the Internet bubble, the total reported book value of CMGI’s assets declined from approximately $8.5 billion to $2 billion between its fiscal year ended July 31, 2000 and its fiscal year ended July 31, 2001. During its fiscal year ended July 31, 2001, CMGI recorded charges for “impairment of long-lived assets” of over $3.3 billion as a consequence of its declining operating results and the declining value of its assets.
A major part of CMGI's business always was, and remains today, acquiring interests in emerging companies, growing them and selling them off at greatly enhanced values. Thus, buying and selling subsidiaries was not an uncommon thing for CMGI to do. But, the bursting of the Internet bubble, followed by the hemorrhaging of cash of many CMGI subsidiaries, presented the need for more selling and disposition of than buying subsidiaries.
CMGI began to divest itself of subsidiaries that could not be operated profitably. CMGI also decided to retain and enhance assets deemed to be core assets that could best return CMGI’s operations to profitability. In particular, from September 9, 2002 through April 30, 2003, CMGI sold or shut down eight subsidiaries. In doing so, it limited its operating losses and moved toward focusing its business in one existing area: supply chain management. The business that CMGI retained was primarily within SalesLink and one other subsidiary in the same business.
In doing this, the nature of CMGI’s business was stripped of its former heavy emphasis on Internet-related companies.
In July 2002, through a subsidiary called SL Supply Chain Services International Corp., CMGI acquired the assets of another supply chain management company called Software Logistics Corporation d/b/a Logistics for $44,500,000.
*209 The eight subsidiaries, and the dates upon which they were divested, sold or closed, were as follows:
1. On September 9, 2002, CMGI divested all of its equity and debt ownership interest in Engage, Inc.
2. On September 11, 2002, CMGI sold all of its equity and debt ownership interest in NaviSite, Inc. to ClearBlue Technologies, Inc.
3. On October 17, 2002, CMGI sold all of its equity ownership interest in Equilibrium Technologies, Inc. to a group led by then current management of Equilibrium Technologies, Inc.
4. On February 28, 2003, CMGI sold Yesmail, Inc. to Info USA, Inc.
5. On March 7, 2003, CMGI sold all of its equity ownership in Tallan, Inc. to a group led by then current management of Tallan, Inc.
6. On April 2, 2003, uBid, Inc., a wholly owned subsidiary of CMGI sold substantially all of its assets to Takumi Interactive, Inc.
7. On April 25, 2003, Altavista Company, a majority-owned subsidiary of CMGI, sold substantially all of its assets and business to Overture Services, Inc.
8. During the quarter ended April 30, 2003, CMGI discontinued operation of ProvisionSoft f/k/a CMGion.
CMGI still owns SalesLink and SL Supply Chain Services International Corp. Of the eight entities divested, sold or closed in the period between April 30, 2002 and April 30, 2003, the sale of Alta Vista was by far the most successful. The proceeds from the AltaVista sale amounted to approximately 24% of CMGI’s April 30, 2003 assets. By contrast, the proceeds from the other seven dispositions totaled less than 3% of CMGI’s April 30, 2003 assets.
Also, before, throughout and after the period material to this case, CMGI operated a venture capital affiliate called CMGI@Ventures (“@Ventures”). (©Ventures operates four venture capital funds, some of which have subsidiary funds. It was through the ©Ventures funds that CMGI acquired or invested in those entities that formed CMGI’s portfolio of subsidiaries. Prior to the time of Hoppe’s retention Agreement, CMGI had been spectacularly successful in its acquisitions and sales of its various “subsidiaries.” That success withered in equally staggering fashion with the burst of the Internet bubble.[1]
As of April 30, 2003, the ©Ventures portfolio included investments in approximately 22 companies.
On January 17, 2003, at a meeting between Hoppe and George McMillan, CMGI’s then Chief Executive Officer, Hoppe was advised that when the sale or shutting down of the eight subsidiaries described above became complete, the size and complexity of CMGI would be significantly diminished and the necessity of having a CIO position could no longer be justified. Consequently, she was told that her position was being eliminated. The termination was effective April 30, 2003, although Hoppe apparently stayed on thereafter until near the end of June 2003.
Hoppe was not unfamiliar with severance agreements for corporate executives. At least twice before joining CMGI, she had been the recipient of executive severance packages.
According to the condensed consolidated balance sheet of CMGI and its various subsidiaries for the period ending April 30, 2003, it had total assets of $448,339,000. This was down from $910,267,000 as of July 31, 2002 and down from $1,158,115,000 on April 30, 2002.
Of the total assets of $448,339,000 at April 30, 2003, the amounts received for the entities sold during the prior year came to about 28.4% of the total assets.
For the fiscal year ending July 31, 2004, CMGI was once again profitable. In that fiscal year, CMGI reported net income of approximately $87 million.
On September 10, 2002, immediately before the eight transactions described above, CMGI’s common stock was trading at $.54, and its market capitalization was approximately $216 million. On April 30, 2003, CMGI’s common stock was trading at approximately $.99, and its market capitalization was approximately $396 million.
Since going public, CMGI has always been owned by stockholders who have purchased its shares on the Nasdaq stock exchange. Changes in ownership have only occurred by virtue of sales of stock on the open market. Since April 30, 2002, no single person or entity has ever owned or acquired a majority of CMGI’s publicly traded shares. On October 18, 2002, there were approximately 5,673 holders of record of the CMGI common stock.
At all times between April 30, 2002 and April 30, 2003, the same individuals held the positions of CEO, CFO, Executve Vice President and General Counsel. Also, throughout David Wetherell (“Wetherell”) was Chairman of the Board. Since CMGI went public, Wetherell always has been the largest beneficial owner of CMGI stock.
No buyer of any assets that CMGI disposed of between April 30, 2002 and April 30, 2003 assumed a management position at CMGI or a position on CMGI’s Board of Directors.
It is in this factual context that the Court must now assess the particular legal issues that apply and make its rulings of law.

RULINGS OF LAW

The resolution of this case depends to a great degree upon a proper interpretation of the October 25, 2001 Agreement between Hoppe and CMGI. This involves, generally, questions of law for the Court. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [the Court] will ‘construe *210 the words of the [Agreement] in their usual and ordinary sense.’ ” 116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of a document’s language does not necessarily establish an ambiguity. Lumbermans Mut. Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
The Agreement is, however, to be read in light of the circumstances of its execution, which may enable a Court to see whether its words can be understood or are actually ambiguous. Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973).
When an element of ambiguity does appear in a document, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of any ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the [Court] is to construe the [Agreement] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the October 25, 2001 Agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous document, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written document. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
Earlier, in assessing CMGI’s motion for summary judgment, this Court found the Agreement to have an element of ambiguity. This Court has been taught how to deal with such a situation. See President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 896-97 (2003) (“PECO”). Although the situation here is not the same in all respects, the Appeals Court’s rulings in PECO provide guidance.
Neither party’s interpretation of the contracts commends itself to us to the exclusion of the other. We therefore conclude that the agreements by themselves do not reveal an answer to the question at issue, if indeed there is one. This is the essence of ambiguity. Contract language is ambiguous “where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken . . .” Once the contract is determined to be ambiguous, the court is free to look to extrinsic evidence ... in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract . . . When such evidence is considered, it may be that a logical answer consistent with the purposes of the agreements and the intentions of the parties will emerge.
We recognize, however, that this may be a question that the parties simply never considered. Should the trial court so determine, that does not frustrate a sensible resolution. “When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court...” In these circumstances, the court does not base a decision upon evidence of prior negotiations or agreements, although suchevidence may be admitted as bearing on what may be reasonable . . .
PECO, supra, 57 Mass.App.Ct. at 895-96.
All of the evidence, extrinsic and otherwise, has been heard, and the Court can now determine whether, “[w]hen such evidence is considered, ... a logical answer consistent with the purposes of the agreement]] and the intentions of the parties will emerge.” In doing so, the Court, as instructed in PECO, will attempt to “give a reasonable construction in light of the intentions of the parties at the time of the formation of the contract” at its outset in 2001 and at its implementation in 2003.
The disagreement between Hoppe and CMGI relates to whether what occurred within the one year leading up to Hoppe’s termination constituted “a sale, lease or disposition of all or substantially all of the assets” of CMGI. This phrase is used in the context of a change in control as defined in the Agreement. The answer may be found in assessing the language of the Agreement and then applying the factual situation to that interpreted language.
As this Court stated in its summary judgment memorandum, “the rub comes with the words ‘substantially all,’ which remain undefined in the Agreement.”
Again, in its summary judgment decision this Court posed the issues as follows:
The phrase “substantially all” in the CMGI Agreement has dictionary meanings that do not provide an answer. The adverb “substantially,” although having a number of definitions, most closely here means considerable, ample or large, perhaps in worth or value. But what does that mean when assessing the sale or disposition by CMGI of eight of nine subsidiaries? Should the Court simply count numbers and attempt to conclude whether eight of nine — 88.88%—equals “substantially all?” Or should it attempt an assessment as to whether the one subsidiary not sold or disposed of had some degree of economic girth that significantly outweighed the combination of the remaining eight?
*211 Further, in any attempt to determine the intended meaning of the phrase in issue, the Court must not lose sight of the fact Hoppe was terminated not for cause, but as a direct result of the very elimination of the eight subsidiaries. This is part of the circumstances of the Agreement’s execution which courts are instructed to consider in determining the meaning of contractual language.
“The terms stated by the parties will be taken in their plain and ordinary sense unless otherwise indicated in the contract.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). See also 116 Commonwealth Condominium Trust, supra, 433 Mass. at 376. What the parties suggest, however, is not dispositive of the matter, and neither cites to a determinative Massachusetts appellate case in the context of a retention agreement or similar situation.
Hoppe’s position is that the Agreement’s controlling language “sale, lease or disposition of all or substantially all. . . assets” means the sale, lease or disposition of substantially all of CMGI’s “operating subsidiaries.” She would, thereby, limit the word “assets” to “operational” assets only. Hoppe proffers no case law directly supporting her position.
CMGI takes the position that no such limitation is included in the plain language of the Agreement. Rather, it says, the language must be read to mean “all but very few” assets as measured by CMGI’s balance sheet. CMGI points, among others, to Susser v. Cambria Chocolate Co., 300 Mass. 1 (1938); however, this Court finds little help there.
The phrase “all, or substantially all” is not, however, new in the corporate sense when dealing with the disposition of assets. It appears most recently in the Massachusetts Business Corporation Act, G.L.c. 156D, sec. 12.01,[2] which deals, among other things, with the sale of corporate assets. Comment 1 to sec. 12.01 reads as follows:
The phrase “all or substantially all,” chosen by the draftsmen of the Act, is intended to mean what it literally says, “all or substantially all.” The phrase “substantially all” is synonymous with “nearly all” and was added merely to make it clear that the statutory requirements could not be avoided by retention of some minimal or nominal residue of the original assets. A sale of all the corporate assets other than cash or cash equivalents is normally the sale of “all or substantially all” of the corporation’s properly. A sale of several distinct manufacturing lines while retaining one or more lines is normally not a sale of “all or substantially all” even though the lines being sold are substantial and include a significant fraction of the corporation’s former business. If the lines retained are viewed only as a temporary operation or as a pretext to avoid the “all or substantially all” requirements, however, the statutory requirements of chapter 12 must be complied with. Similarly, a sale of a plant but retention of operating assets (e.g., machinery and equipment), accounts receivable, good will, and the like with a view toward continuing the operation at another location is not a sale of “all or substantially all” the corporation’s property.
A recent Delaware Chancery Court decision provides similar guidance.
“All” means “all,” or if that is not clear, all, when used before a plural noun such as “assets,” means “(t]he entire or unabated amount or quantity of, the whole extent, substance, or compass of, the whole.” “Substantially” is the adverb form of “substantial.” Among other things, substantial means “being large but not wholly that which is specified.” “Substantially” conveys the same meaning as “considerably” and “essentially” because it means “to a great extent or degree” and communicates that it is very nearly the same thing as the noun it acts upon. In all their relevant meanings, substantial and substantially convey the idea of amplitude, or something that is “(cjonsiderable in importance, value, degree, amount, or extent.” A fair and succinct equivalent to the term “substantially all” would therefore be “essentially everything.”
Hollinger, Inc. v. Hollinger Intern., Inc., 858 A.2d 342, 377 (Del.Ch. 2004).
In the context of determining whether there was a de facto merger of one corporation into another, the Supreme Judicial Court concluded that a sale that “included customer lists; customer contracts; furniture, fixtures and furnishings; service parts, equipment, and service supplies; trademarks; trade names; service marks; licenses and logos; contracts; agreements and leases; automotive equipment and motor vehicles; leasehold interest; goodwill; and certain prepaid expenses and all business and other books, papers, files, and records, with certain exceptions” constituted a sale of “substantially all” of the corporation’s assets. Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. 356, 358 n.5 (1997).
Given this legal background, the Court next focuses on the context of the situation before it.
Hoppe argues that the sale of eight out of nine subsidiaries[3] is a sale of substantially all of CMGI’s assets. This, she argues, is particularly so because the nature of CMGI’s business changed from an Internet focus to a supply chain management company.
Despite the position taken by Hoppe in her post-trial proposed findings, both Hoppe and CMGI agreed and urged during the trial that the word “assets” as used in the Agreement should be assets as set forth on CMGI’s balance sheet.[4] Those assets are, of course, more than just the operating subsidiaries. As noted in the findings above, after the sale or disposition of the eight subsidiaries, CMGI still had assets worth $448,339,000. Those assets were made up of a number of different things, including the SalesLink and SL Supply Chain Services International Corp. subsidiar *212 ies, the @Venture capital funds, cash and cash equivalents, available-for-sale securities, accounts receivable, property and equipment, investments in affiliates, goodwill and other assets. CMGI was never essentially out of business. Rather, as one witness pointed out, it had shrunk in order to grow.
Further, the economic value of the eight subsidiaries that were jettisoned was no more than 28.4% of the total assets at April 30, 2003 of $448,339,000.
To be sure, CMGI may be said to have changed the nature of its business. As the Comment to the Massachusetts Business Corporation Act observes, however, the “sale of several distinct manufacturing lines while retaining one or more lines is normally not a sale of ‘all or substantially all’ even though the lines being sold are substantial and include a significant fraction of the corporation’s former business.”
The context of paragraph 2(a) of the Agreement, involving, as it says, “Severance Pay Following a Change in Control,” cannot be overlooked. There was no change of control here. CMGI continued in business with essentially the same shareholders and most of the same corporate officers. And no buyer of any assets that CMGI disposed of between April 30, 2002 and April 30, 2003 assumed a management position at CMGI or a position on CMGI’s Board of Directors.
What occurred was not the extraordinary kind of event that happens when a company sells essentially all of its assets and goes out of business. CMGI did not sell, lease or dispose of “all or substantially all of the assets.” Hoppe, therefore, is not entitled to the enhanced severance benefits provided in Section 2(a) of her Executive Retention Agreement with CMGI.
Hoppe argues further that if she cannot recover under Section 2(a), then she should be able to recover severance under Section 2(b) because she was not terminated for cause. Setting aside the fact that her complaint contains no claim for Section 2(b) severance and no declaratory relief is asked for, the Court nevertheless makes the following observations.
Section 2(b) provides for payments thereunder
In the event the employment of [Hoppe] is terminated by [CMGI] for a reason other than for Cause [Hoppe] agrees that after the Termination Date, but prior to payment of the severance pay called for by this paragraph, she shall execute a release, based on [CMGI’s] standard form severance agreement, of any and all claims she may have against [CMGI] and its officers, employees ... [Hoppe] understands and agrees that the payment of the severance pay called for by this paragraph [is] contingent on her execution of the previously described release of claims.
As recited in the findings above, on June 16, 2003, Hoppe executed the standard form severance agreement and general release. Then, on June 23, 2003, with the advice of counsel she revoked the release. There being no evidence that Hoppe has subsequently executed the general release, she is not entitled to recovery under Section 2(b).
Whether Hoppe, having failed in her effort to recover Section 2(a) benefits, can now sign the release and receive Section 2(b) benefits is far from clear and was not tried before this Court; or if it was so tried, it was not proved. The purpose for the release seems obvious: to avoid the very litigation to which CMGI was subjected on Hoppe’s Section 2(a) claim. That avoidance is now not possible.
Further, this case was filed on August 7, 2003, over two years ago. Performance under a contract that does not have a specific date therefor is not extended indefinitely. A Court will impose a reasonable time for such performance. See e.g., Charles River Park, Inc. v. Boston Redevelopment Authority, 28 Mass.App.Ct. 795, 814 (1990). To the extent a reasonable time has become a question of law in this case, see Powers, Inc. v. Wayside, Inc. of Falmouth, 343 Mass. 686, 691 (1962), this Court rules that two years is too much under the circumstances here.[5]
Finally, this Court is concerned that Hoppe, by rescinding the release and proceeding to trial on the Section 2(a) claim, has, thereby, made an election of remedies from which she cannot now retreat. See e.g., Plante v. Town of Grafton, 56 Mass.App.Ct. 213, 219 (2002); Barnes v. Peck, 283 Mass. 618, 622-24 (1933).

ORDER FOR JUDGMENT

Upon the foregoing findings of fact and rulings of law, this Court orders judgment for the defendant, CMGI, Inc., dismissing the Plaintiffs Complaint, with prejudice, with each party to bear her or its own costs.

 Locals in the Boston area will recall that the newly built stadium home of the New England Patriots football team was originally named CMGI Field. When the effect of the Internet bubble’s burst was felt by CMGI, its name came down from the walls of the football field, which is now called Gillette Stadium.

 The Court is cognizant of the fact that the new Massachusetts Business Corporation Act was not in effect until July 1, 2004, long after the matters in issue here. Nevertheless, the phrase used was not unfamiliar to business lawyers, and the definition in the Comment is helpful.

 The parties dispute whether the number of subsidiaries was nine or ten. Hoppe argues for nine because of her belief that SalesLink and iLogistix were merged and became one. CMGI states that these two entities remained separate corporations, albeit in the same line of business.

 This, of course, is consistent with the definition of “asset” contained in Black’s Law Dictionary, Second Pocket Edition (2001): “The entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill.”

 The Court is aware that Section 2(a) contains nearly identical language requiring the execution of a release before there is any obligation for CMGI to make payment of the severance pay and acceleration of options called for by that section. The legal provisions regarding the absence of a release that apply to Section 2(b) apply with equal force to the Section 2(a) claims.