Fecteau, Francis R., J.
Bowditch & Dewey, LLP (“Bowditch & Dewey’’) provided legal services to HBA Cast Products Company (“HBA”) for which they were never paid. Bowditch & Dewey brought this action seeking to recover those attorneys fees against DieC-ast Realty Holdings, LLC, DieCast Connections Company, Inc., Hawkeye Capital Associates, LLC, and Beth Zastawny (“Zastawny”) alleging (1) successor liability (Count I), (2) breach of contract (Count II), (3) promissory estoppel (Count III), and (4) third-party beneficiary (Count IV).[3] This matter is now before this Court on the remaining defendants’ Motion for Summary Judgment as to all counts of the complaint. The plaintiff opposes this motion arguing that in continuing to provide legal services to HBA they relied upon Zastawny’s representations that she was trying to find a buyer of HBA that would assume the debt HBA owed to Bowditch & Dewey. For the following reasons, the defendants’ Motion for Summary Judgment as to Count III is DENIED and as to Counts I, II and IV is ALLOWED.

SUMMARY JUDGMENT RECORD

The summary judgment record contains the following undisputed facts and disputed facts viewed in the light most favorable to Bowditch & Dewey, the non-moving party.
HBA was a company engaged in the development, manufacture and sale of aluminum and zinc castings and had its principal place of business at 262 Liberty Street, Springfield, Massachusetts. Zastawny served as HBA’s Treasurer, Chief Financial Officer, and de facto Chief Executive Officer. From September 2002 through January 2004, Zastawny requested Bowditch & Dewey, a large law firm located in Worcester, Massachusetts,[4] to perform legal services for HBA. Zastawny dealt primarily with attorney John R. Blake (“Blake”). By December 2003, HBA owed Bowditch & Dewey $146,000 in unpaid attorneys fees.
During this period, it became apparent to both Zastawny and Bowditch & Dewey that HBA was experiencing serious financial difficulties and that its long-term survival was doubtful. In January 2003, Blake and Zastawny exchanged a series of e-mails about HBA’s ability to pay the past due attorneys fees. These e-mails discussed the timing and amounts of payments, as well as possible alternate sources of funds to pay the outstanding attorneys fees. In March 2003, Fleet Bank (“Fleet”) and HBA had closed on a refinance loan to HBA for approximately $3.5 million, certain terms of which, by May 2003, HBA had defaulted. As a result, Fleet placed HBA into “workout” status with Fleet becoming active in the day-to-day operations of HBA, including Fleet’s direction of HBA’s financial operations, such as involving the timing and amount of payments HBA could make to its creditors, including Bowditch & Dewey. The plaintiff was well aware of HBA’s “workout” status with Fleet and knew that Fleet was controlling HBA’s finances.
Bowditch & Dewey informed Zastawny that it needed payment on its overdue invoices if it were to continue to provide services to HBA. Ultimately, Bowditch agreed to provide additional legal services but dependent upon being satisfied with HBA’s ongoing efforts to make payments. During 2003, Blake often conditioned the provision of further services by Bowditch & Dewey upon HBA making a partial payment.
Bowditch & Dewey claims, taken as true for the purpose of summary judgment, that in December 2003, as she had on many prior occasions, Zastawny assured them that the overdue attorneys fees would be assumed by any potential purchaser of HBA, that Bowditch relied on those assurances when they agreed to perform further services for HBA in the face of this outstanding debt for attorneys fees. Specifically, Bowditch & Dewey contends that in December 2002, and January 2003, Zastawny promised that when HBA’s assets were sold, she would make certain that Bowditch & Dewey was paid. Likewise, in December 2003, Bowditch & Dewey allege that Zastawny promised that DieCast would assume Bowditch & Dewey’s accounts receivable. In their response to the defendants’ Statement of Material Facts, Bowditch & Dewey admits that “it could have . . . taken action to *26 secure its position, including liens on the assets and not doing further work” rather than continuing to provide legal services to HBA while it was owed outstanding attorneys fees.
Blake attempted to help Zastawny locate potential purchasers of HBA. After a failed attempt by Zastawny and William Douglas Gillespie (“Gillespie”), another HBA employee who was employed as a plant manager, at a management buyout brokered by a third party, Hawkeye Financial (“Hawkeye”), in early 2004, Fleet exercised its secured party rights and took control of HBA’s assets in February 2004. The record shows that prior to this foreclosure, Fleet had given the owners of HBA and Hawkeye a narrow window of time in which to finalize their proposed buyout but that the transaction did not close in time, due to delays attributable to the HBA shareholders. After foreclosure, knowing of her interest and in an attempt to minimize its losses, Fleet approached Zastawny as a representative of a potential purchaser of HBA’s assets that were under Fleet’s control.
On March 18, 2004, DieCast Connections Company, LLC[5] (“DieCast”) was organized under the laws of Delaware and was registered to do business in Massachusetts. DieCast Connections was incorporated in Massachusetts on June 30, 2004, with Zastawny and Gillespie as its only officers and directors. DieCast purchased certain assets of HBA directly from Fleet, rather than by a direct sale from the owners of HBA, contrary to that contemplated in the Hawkeye proposal, due to the exercise by Fleet of its secured party rights, with independent financing provided to DieCast through TD Banknorth. DieCast paid Fleet $2.6 million for the selected assets and HBA’s real property located in Virginia, which was almost $1 million less than that offered in the Hawkeye-HBA proposal. The bill of sale expressly provided that Die-Cast did not assume any HBA liability to Bowditch & Dewey.
Zastawny served as DieCast’s President, Chief Financial Officer, Treasurer, and Director. While at HBA she served as the Chief Financial Officer, Treasurer and de facto Chief Executive Officer. She reported directly to the President of HBA until 2002, after which she reported to HBA’s Board of Directors. Gillespie served as DieCast’s Vice President, Clerk, and a Director. Zastawny and Gillespie were never shareholders or directors of HBA.[6] None of HBA’s shareholders or directors have any ownership interest or involvement in any way in DieCast. Zastawny and Gillespie are the sole owners of DieCast, owning seventy percent and thirty percent, respectively.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The non-moving party cannot conjure up genuine issues of material fact or merely rely on the allegations or denials of her pleading. See Mass.RCiv.P. 56(e). Conclusory statements, general denials, and allegations not based on personal knowledge are insufficient to avoid summary judgment. Madsen v. Erwin, 395 Mass. 715, 721 (1985). Rather, the non-moving party bears the burden of introducing enough countervailing data to demonstrate the existence of a genuine issue for trial. See Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999).

A. Count I - Successor Liability

[Traditional corporate law principles [prescribe] that the liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.
Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. 356, 359 (1997) (citation omitted). The opposition of Bowditch & Dewey to the defendants’ motion is not viewed as suggesting that DieCast is responsible under the successor corporate liability exception to the general rule of non-liability because the transaction was a fraudulent effort to avoid the liabilities of the predecessor, or that there was a de facto merger; if it is to be liable as a successor, it must be under the “mere continuation” theory or due to the defendants having expressly or impliedly assumed the debt.

1. Mere Continuation Exception

In analyzing a claim for successor liability under the theories of de facto merger or mere continuation, the focus is on whether one company has become another for the purpose of eliminating its corporate debt. The terms “de facto merger” and “mere continuation” are often used interchangeably. “The concept of ‘de facto merger’ has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity.” National Gypsum Co. v. Continental Brands Corp., 895 F.Sup. 328, 336 (D.Mass. 1995). “By contrast, a ‘mere continuation’ has most often *27 been found where the owners of the selling entity set up the buyer with the specific purpose of continuing their business under a new form.” Id. Courts scrutinize transfers of corporate assets to determine if the transfer allowed the “shareholders to retain the benefits of their ownership interest while leaving creditors without a remedy." Id. at 337.
In Cargill, the court enumerated:
The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.
Id. at 359-60. “No single factor is necessary or sufficient to establish a de facto merger” or mere continuation. Id. at 360.
Although Bowditch & Dewey alleges that DieCast continued in the same location, with the same personnel, with much of the same business assets, and operated essentially the same business as HBA, it fails to satisfy the other three factors. First, there is absolutely no continuify of shareholders. No shareholders or directors of HBA have any ownership interest or control whatsoever in DieCast. Zastawny and Gillespie are the sole shareholders of DieCast and were not shareholders of HBA.
Second, although HBA essentially ceased its ordinary business operation, it did not dissolve as soon as legally possible. It is undisputed that HBA continued to own the property at 262 Liberty Street, Springfield, Massachusetts through at least October 2006. Further, DieCast continued to pay $3,000 per month in rent to HBA from the time of the sale through October 2006.
Third, Bowditch & Dewey admit that DieCast “assumed certain accounts payable of HBA.. . including those related to Zastawny’s and a few former HBA customer-related creditors.” (Emphasis supplied.) Bowditch & Dewey’s Memorandum in Opposition to Defendants’ Motion for Summary Judgment, Material Facts, par. 17. Bowditch & Dewey do not contend that DieCast assumed the obligations of HBA necessary for the uninterrupted operation of normal business obligations.
“[T]he indices of a ‘continuation’ are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets.” McCarthy v. Litton Indus. Inc., 410 Mass. 15, 23 (1991). Because three of the four factors are not met here, DieCast cannot be considered amere continuation of HBA. DieCast does not have any of the same shareholders as HBA, HBA continued to survive as a legal entity for some period of time, and DieCast only assumed some of HBA’s obligations.
This record does not reveal any evidence that the seller set up the buyer with the specific purpose of continuing their business in a new form. It is clear that HBA had serious financial troubles and defaulted on their loan. There is no evidence to suggest that the directors or shareholders of HBA did anything intentionally to cause the default. Further, no shareholders or directors of HBA have any ownership interest or control whatsoever in DieCast. Zastawny and Gillespie, former employees of HBA, are the only people who have an ownership interest in DieCast, having purchased some of HBA’s assets, not from HBA, but rather from Fleet, the bank that was in the process of foreclosing on HBA’s loan. There is no evidence that the directors or shareholders of HBA arranged a sale of HBA in order to avoid paying its debts. As this Rule 56 record does not provide any evidence to support the mere continuation exception to the general rule of non-liabilily of successor corporations, the debts of a predecessor corporation, HBA, should not be imposed on the successor corporation, DieCast, under that exception.

2. Express or Implied Assumption of the Debt Exception

The bill of sale between DieCast and HBA expressly provided that DieCast did not assume any HBA liability. In the face of an express non-assumption of liability by DieCast for this debt owed to the plaintiff by HBA, there can be no genuine issue of material fact that exists as to whether DieCast impliedly assumed this debt. “The rule is that one cannot be held liable on an implied contract to pay for that which he declines to permit to be done on his account.” Keith v. De Bussigney, 179 Mass. 255, 259 (1901). This is true notwithstanding the statements by Zastawny that expressed or implied that any company in which she eventually acquired an equiiy interest would assume the debt and even when considered with her assurances that she would try to find a buyer who would assume the debt owed to Bowditch & Dewey on account of these outstanding fees and that those bills would be assumed if the Hawkeye deal went through, Zastawny and Gillespie being the two prospective owners of DieCast as they were in the Hawkeye deal. Summary judgment is thus warranted on the *28 plaintiffs claim against the parties for successor corporate liability.

B. Count II - Breach of Contract

In order to recover under a breach of contract theory the plaintiff has the burden of proving that (1) the parties entered into a valid and binding agreement, (2) that the defendant breached the terms of the agreement, and (3) that the plaintiff suffered damages from the breach. Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999); Canney v. New England Tel & Tel Co., 353 Mass. 158, 164 (1967).
Bowditch & Dewey and DieCast never executed a formal written contract with respect to paying the outstanding attorneys fees. To find that such a contract existed would depend upon communications, both oral and by e-mail, between Zastawny and Blake.[7] Taking all of Bowditch & Dewey’s assertions as true, Zastawny’s alleged promises do not constitute a contract. At most, Zastawny’s assertions express a desire to pay Bowditch & Dewey the money owed to it and, if a buyer was found, that she would try to negotiate an assumption of liability on the part of the buyer for that debt. It is without cavil that Zastawny could neither guarantee that a buyer could be found, by either she or HBA, nor that any buyer, if found, would be agreeable to an assumption of that liability. Bowditch & Dewey continued to provide legal services well-knowing of the financial straights in which HBA was in and that a free market purchaser might never be found; moreover, it was unreasonable for the plaintiff to expect that a buyer, if found, could be persuaded to accept this debt. No evidence in the summary judgment record supports a finding that a contract existed. At most, Zastawny’s communications were precatory, with no evidence that her expressed intentions were false when made. Because there is no evidence, sufficient to demonstrate a genuine issue of material fact on the existence of a contract, the breach of contract claim cannot stand.
C. Count III - Promissory Estoppel
Promissory estoppel may arise where there is “(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission.” Sullivan v. Chief Justice, 448 Mass. 15, 27-28 (2006).[8] “(T]he reliance of the parly seeking the benefit of estoppel must have been reasonable.” Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 125 (1992). “All of the elements of estoppel must be present and the party asserting the estoppel theory ‘has a heavy burden to prove that all [three] elements are present.’ ” Sullivan, supra, at 28, quoting Clickner v. Lowell, 422 Mass. 539, 544 (1996), in turn quoting from Harrington v. Fall River Housing Authority, 27 Mass.App.Ct. 301, 309 (1989).
Even assuming that Zastawny made actionable representations, a questionable proposition in its own right but one deemed sufficient to overcome the defendants’ motion on this record, and that such representations were intended to induce Bowditch & Dewey, and did induce it to act to their detriment by continuing to provide legal services to HBA, on this record, I cannot find, as a matter of law, that the reliance of the plaintiff was unreasonable. The record demonstrates that Bowditch & Dewey is a large, experienced, highly respected law firm located in the ciiy of Worcester, with departments that specialize in corporate law and business litigation. It must concede knowledge that there were more secure alternatives to its continuing to provide legal services to HBA while the outstanding balance was not paid, amongst which were security interests or liens on HBA’s assets as well as that it could have stopped providing legal services until the outstanding balance was paid.
When observed in a vacuum, it was not reasonable for Bowditch & Dewey to continue to provide legal services to HBA when HBA was not able to pay all of the legal fees it had already incurred, especially given Bowditch & Dewey’s knowledge of HBA’s financial health and the unlikelihood of HBA’s long-term survival; this is true certainly after Fleet’s exertion of financial control, but is true prior thereto as well. Certainly, once Fleet took over the assets of HBA, at a point in time that a substantial amount of the fees it now seeks were long overdue, Bowditch knew or should have known that Zastawny’s authority to act on behalf of HBA would likely be sharply limited or even curtailed; furthermore, it knew or should have recognized that any sale arranged by Fleet could involve substantially different entities, parties, terms and arrangements than that previously envisioned by either Bowditch or Zastawny.
However, while it is a close question, doubt must be resolved in favor of the non-moving party in finding the existence of a genuine issue of material fact as to whether Zastawny’s interest in acquiring an equity interest in a prospective purchaser coupled with her assurances to Bowditch that she would try to find a buyer who would assume the debt, implied or provided some reason for them to think that if she became an equity owner, the debt owed to Bowditch would be assumed by the acquiring company or which would provide a basis to find reasonable reliance on her statements. By late 2003, Zastawny had expressed an interest in acquiring an equity interest in a prospective purchaser, expressed an interest in seeing Bowditch & Dewey’s outstanding bills for attorneys fees were paid, and expressly stated that those bills would be assumed if the Hawkeye deal went through. Zastawny and Gillespie, the same two prospective owners as in the Hawkeye deal, eventually became equity owners of DieCast, albeit with a different bank providing the financial backing. If Bowditch & Dewey did rely on Zastawny’s statements, whether its reliance was rea *29 sonable given the wishful nature of those statements, HBA’s known financial difficulties and Bowditch & Dewey’s sophistication in the law, and specifically the area of business litigation remains questionable but not conclusively unreasonable. While it was likely unreasonable, as a matter of law, for the plaintiff to continue to act with an expectation that she was in any position of authority to bind any third-party buyer with whom she was not related, it may have been reasonable to rely upon her assertions in the context of her interest in becoming a buyer in one form or another. As it happened, Zastawny emerged as the controlling equity owner and an officer of the purchaser. On this record, I cannot conclude as a matter of law that the statements and actions by Zastawny did not imply a reasonable basis to believe that any company that acquired the assets of HBA and in which she acquired an equity interest would not assume the outstanding fees owed to the plaintiff, nor can I conclude as a matter of law that the reliance of the plaintiff on said statements was otherwise unreasonable. Because a genuine issue of material fact exists, summary judgment is inappropriate on this promissory estoppel claim.
D. Count IV - Third-Party Beneficiary
Bowditch & Dewey contends that they are third-party beneficiaries of a contract between DieCast and Fleet and are thus able to maintain an action for breach of contract. Enforcement by third-party beneficiaries is limited to situations where the beneficiary is an intended third-party beneficiary. “It must appear from ‘the language and circumstances of the contract that the parties to the contract clear[ly] and definite[ly]’ intended the beneficiaries to benefit from the promised performance.” Miller v. Mooney, 431 Mass. 57, 62 (2000), quoting Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366-67 (1997).
Bowditch & Dewey have failed to demonstrate by any evidence in the summary judgment record that the plaintiff was an intended third-party beneficiaiy, a status supported by terms of the contract between DieCast and Fleet. Indeed, the opposite is true: the contract between DieCast and Fleet, the bill of sale, expressly provided that DieCast did not assume any HBA liability to Bowditch & Dewey. Because the summary judgment record is devoid of any evidence that the parties intended Bowditch & Dewey to be a third-party beneficiaiy, that claim must fail.

ORDER

For the foregoing reasons, the Motion for Summary Judgment of the defendants, DieCast Realty Holdings, LLC, DieCast Connections Company, Inc., and Beth Zastawny, is ordered DENIED as to Count III and ALLOWED as to Counts I, II and IV.

On April 19, 2006, Hawkeye Capital Associates, LLC was voluntarily dismissed with prejudice as to all of the claims by agreement of the parties.

John R. Blake, a partner at Bowditch & Dewey, testified at his deposition that Bowditch & Dewey employed sixty-five attorneys and had between fifteen and seventeen attorneys in the business and commercial department. Further, he testified that he concentrates his practice in business law, including the formation and operation of businesses, business contracts, mergers, acquisitions, and asset purchases.

DieCast Connections Company, LLC subsequently changed its name to DieCast Realty Holdings, LLC.

The shareholders of HBA were Joseph J. Deliso, Sr. Irrevocable 1986 Trust, Joseph J. Deliso, Sr. Family 1956 Trust, Clement J. Deliso, Sr., Virginia Deliso Govoni, Deborah Newsome Richardson, Jennifer Newsome, Joseph J. Deliso, Jr., and John P. Deliso.

To the extent that Bowditch & Dewey’s complaint alleges personal liability of Zastawny under any theoiy of contract liability, express or implied, between herself and Bowditch & Dewey, such a claim has no support in this motion record. Bowditch & Dewey has not provided any evidence that either party viewed Zastawny’s promises as the basis to believe she was ever acting in her individual capacity. Further, there is no evidence that she received any consideration for her alleged promises to make sure that any potential buyer would assume the debt. Bowditch & Dewey’s continuing to provide legal services was a benefit to HBA, not Zastawny. Because there is no reasonable basis to think that Zastawny was personally entering into a contract, the claim of breach of contract claim against her in her individual capacity must also fail.

In Sullivan, the court noted the difference between equitable and promissoiy estoppel, allowing that “reliance on a misrepresentation of future intent” may support an action of promissory estoppel while “reliance on a misrepresentation of past or present facts” may serve as the basis for equitable estoppel. Sullivan supra, 28 at fn. 9.