van Gestel, J.
This matter is before the Court on cross motions for summary judgment. What is involved is the interpretation of an earn-out provision in an asset purchase agreement.

BACKGROUND

Instrument Industries, Inc. d/b/a New England Affiliated Technologies (hereafter “NEAT’) sold most of its assets and some of its liabilities to Kollmorgen Corporation (“Kollmorgen”) pursuant to an Asset Purchase and Sale Agreement (the “Agreement”) dated April 21, 1999. Instrument Industries Trust (the “Trust”) was also a party to the Agreement. The detailed Agreement is spread over 65 pages of single-spaced type and includes 282 additional pages of exhibits.
The parties to the Agreement are sophisticated concerning the subject matter thereof and were represented by competent counsel in its drafting and execution.
The purchase price was “$16,725,000 plus any earn-out payments made pursuant to Section 2.5" of the Agreement. It is one aspect of the earn-out payments provision that is in issue in this case. It is in Section 2.5.4, which reads as follows:
From and after the Closing Date, nothing herein shall prohibit Buyer; or vitiate any rights of the Buyer, to sell all or any part of the Assets or the Business to any third party, provided that if at any time prior to March 31, 2002 (i) the Business is sold, (ii) all or substantially all of the Assets are sold to any third party, (iii) all or any portion of the Business is merged or consolidated without Seller’s written consent, or (iv) Mr. McCarthy or Mr. Petersen are terminated without cause .. . then within thirty (30) days after such event Buyer shall cause to be delivered to Seller by bank wire transfer to Seller’s Account... an amount equal to the discounted present value of the remaining maximum earn out amount payable pursuant to Section 2.5 . . .
The “Business” is defined in the first WHEREAS clause as “the business of manufacturing and selling precision machined motion control systems.”
The “Assets” are referred to in Section 1.1 as “all of Seller’s right, title and interest in and to all of the assets, properties, rights and contracts used in or relating to the Business wherever located, other than” certain excluded assets.
Kollmorgen subsequently was acquired by Danaher Corporation (“Danaher”). NEAT then became a part of Danaher Precision Systems (“DPS”). “Danaher Precision Systems” was simply a name affixed to a portion of Danaher’s business and was not a legal entity as such. NEAT operated as a Danaher division or part of a division, rather than as a separate corporate or other entity. The parties are in disagreement as to the degree to which NEAT was operated as a stand-alone division.
Three events occurred which are at the heart of the present dispute.
First, although NEAT made its target for earn-out payments for the first two years, and received $2,000,000 therefor, it failed to do so in the third year.
Second, Danaher brought in one of its European subsidiaries, a small German corporation named Cleveland Precision Systems (“CPS”), and CPS operated in conjunction with NEAT.
Third, in March of 2002, Danaher acquired the assets of another company named IDC in a bankruptcy sale and began utilizing those acquired assets in the NEAT/CPS operation.
The Trust argues that the actions taken by Danaher with regard to CPS and IDC, as related to the NEAT operation, resulted in a merger or consolidation of the Business conveyed by the Agreement, thus triggering a significant earn-out payment. Danaher argues that the words “merger” and “consolidation” have recognized meanings in the business world, and that what occurred with CPS and IDC was neither a merger nor a consolidation.
Each side makes persuasive arguments, supported by affidavit evidence.

DISCUSSION

“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972); Mass.RCiv.P. Rule 56(c). Here, of course, both parties are moving parties, and each asserts that the facts are not in dispute. Consequently, what will be involved for the Court is an examination and interpretation of Section 2.5.4 of the Agreement.
Not quite two years ago, this Court’s interpretation of a contract as being not ambiguous was the subject of a decision by the Appeals Court in which the following was a significant teaching:
Neither party’s interpretation of the contracts commends itself to us to the exclusion of the other. We therefore conclude that the agreements by themselves do not reveal an answer to the question at issue, if indeed there is one. This is the essence of ambiguity. Contract language is ambiguous “where the phraseology can support reasonable difference of opinion as to the *29 meaning of the words employed and the obligations undertaken.” . . . Once the contract is determined to be ambiguous, the court is free to look to extrinsic evidence ... in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract. . . When such evidence is considered, it may be that a logical answer consistent with the purposes of the agreements and the intentions of the parties will emerge.
We recognize, however, that this may be a question that the parties simply never considered. Should the trial court so determine, that does not frustrate a sensible resolution. “When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.”. . . In these circumstances, the court does not base a decision upon evidence of prior negotiations or agreements, although such evidence may be admitted as bearing on what may be reasonable ...
President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 895-96 (2003).
The PECO case was thus remanded for the usual “further proceedings consistent with [that] opinion.” Id. at 896-97.
The Court, therefore, will first assay the extrinsic evidence presented in the motion papers.
“The terms stated by the parties will be taken in their plain and ordinary sense unless otherwise indicated in the contract.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Although the Table of Contents to the Agreement contains, a Definitions section which includes citations to definitions of 106 different words, phrases and acronyms, nowhere among them is any definition for either of the words “merger” or “consolidate.” Thus, ordinary dictionary definitions will have to, suffice.,
“Merger” is defined in Black’s Law Dictionary, Sixth Edition, as: “The fusion or absorption of one thing or right into another; generally spoken of as a case where one of the subjects is of less dignity or importance than the other. Here the less important ceases to have an independent existence.”
“Consolidate” is defined in Black’s Law Dictionary, Sixth Edition, as: “In a general sense, to unite or unify into one mass or body, as to consolidate several small school districts into a large district, or to consolidate various funds. In legislative usage, to consolidate two bills is to unite them into one. The term means something more than to rearrange or redivide.”
Danaher urges the Court to apply more formal usage of the words merger and consolidate such as is used in the corporate sense. In that sense, there was no merger or consolidation. But here the Agreement is not dealing with a corporation. What the “Business” is, is the use and application of assets acquired from a corporation known as NEAT, which assets were purchased by Danaher’s predecessor Kollmorgen.
Using the more general Black’s definitions of the words, to merge or consolidate the assets of NEAT with CPS, a corporation, or with the assets of IDC, results in two different situations.
It would not seem possible to fuse, absorb, unite or unify the assets of NEAT with the corporate entity of CPS. What would have to happen, it seems, is for CPS to acquire the assets of NEAT or to have Danaher acquire the assets of CPS and unite or unify those assets with the assets of NEAT. Neither of these things has happened, however.
The situation with IDC is different. It would be possible to accomplish a merger or consolidation when dealing with the assets of NEAT and the assets of IDC. This would require the fusion or absorption of NEATs assets into those of IDC or the reverse, or the uniting or unifying into one mass or body of the assets of NEAT and IDC.
The Court observes that the Agreement, in Section 2.5.4(iii), calls for the merger or consolidation of “all or any portion of the Business.” (Emphasis added.) If not all, how large a portion of NEATs or IDC’s assets is enough to satisfy this provision? In the instance here, how much of NEATs or IDC’s assets actually were fused, absorbed, united or unified, and how did that come about?
An affidavit of the attorney who was deeply involved in representing NEAT in the negotiations over the earn-out provisions unfortunately, does not explain why the words “merger” and “consolidate” were utilized when only NEATs assets, and not its stock as a corporate entity, were what was sold to Kollmorgen.
Interestingly, however, Section 2.5.4 is entitled “Sale of Assets or Business,” and the text of the Section speaks of selling “all or any part of the Assets or Business to any third party.” This seems to suggest there may be a difference between the “assets” and the “business.” It could, however, equally well be simply a draftsman’s “belt and suspenders” kind of redundancy, using two words when one would do just as well.
The definitions for the “Business” and for the “Assets” quoted above seem to draw a similar distinction. The assets are the things which are used in “the business of manufacturing and selling precision machined motion control systems.” This use of the word “business” leads the Court back to Black’s Law Dictionary. The definition of “business” there is: “Employment, occupation, profession, or commercial activity engaged in for gain or livelihood . . . Enterprise in which a person engaged shows willingness to invest time and capital on future outcome . . . That which habitually busies or occupies or engages the time, attention, labor, and effort of persons as a principal *30 serious concern or interest of for livelihood or profit.” How, or what, constitutes a merger or consolidation of a business as so defined is far from apparent.
It seems obvious that in order for the earn-out provisions to be fair to both NEAT and Danaher, the assets and the use of those assets acquired from NEAT should be kept and used without any significant addition or subtraction of or to those assets during the earn-out period. If the assets are used in the business of the division, the division should stand sufficiently alone as to enable a fair measure of whether the earn-out payment was due. Whether, and to what extent, that did or did not happen cannot be resolved on either of the cross motions before the Court. But that resolution may provide the Court with the information necessary to provide an interpretation of Section 2.5.4(iii) which is reasonable in the circumstances.[3]
Danaher also argues that to enforce the earn-out provision as sought by the plaintiffs would result in an improper penalty. The applicable law is stated in two relatively innocuous cases: A-Z Servicenter, Inc. v. SegaLL., 334 Mass. 672 (1956), and Renda v. Gouchberg, 4 Mass.App.Ct. 786 (1976).
A-Z Servicenter involved a prepayment provision in connection with a mortgage note for $20,000 on a gasoline filling station. The SJC, at p. 675, stated the law in that case as follows.
Whether a provision of a contract for the payment of a sum upon breach is rendered unenforceable by reason of being a penalty depends upon the circumstances of each case . . . Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced. But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages . . . The words “liquidated damages and not as a penalty” in the instant note is not decisive.
At p. 676, the SJC went on to say:
An acceleration clause advancing the maturity of the principal upon a breach of a mortgage note at the option of the holder is a common provision and has been held legal and binding in this Commonwealth . . . This would also be true as to interest if the acceleration extended no further than to include the interest actually due at the time of the breach ... We think the judge was right in ruling that the acceleration provision in the note constituted a penally.
Renda is a single-paragraph rescript opinion from the Appeals Court, coming just a few months short of 20 years after A-Z Servicenter. It too involved a prepayment provision in connection with a mortgage note. Somewhat cryptically, the Appeals Court ruled:
Assuming, as we must on this record, that the underlying obligation is enforceable, the prepayment provision is not void as a penalty. Unlike the acceleration clause in A-Z Servicenter, Inc. v. Segall, 334 Mass. 672 (1956), the interest required to be paid bears a “rational relation” (id. at 676) to the defendants’ actual damages on prepayment, merely securing to the defendants the “benefit of [their] bargain” with the plaintiffs . . . Because the defendant . . . was not required by law to permit prepayment . . . and because the plaintiffs’ prepayment constituted a voluntary election on their part, cases concerning penalties payable as “liquidated damages” in the event of breach . . . are inapposite.
Judge Botsford, in Dellorfano v. The New England, No. 88-3616, at 5 n.3 (Mass.Super.Ct., July 19, 1990), stated that the legal distinction between voluntary and involuntary prepayments
stem[s] from the fact that, when prepayment is voluntary, no breach of contract has occurred; there is thus no theoretical justification for scrutinizing the premium as a form of damages. Instead, it seems more appropriate that the prepayment premium be viewed as a bargained for fee that is tendered in exchange for the privilege of paying the debt early.
This Court agrees with the sentiment in these cases. What was intended by the earn-out provision was an agreed-upon methodbetween sophisticated businessmento address an element of the purchase price in a way that bridged the parties’ differences in view of the value of the assets sold. Both sides agreed that if certain profit targets were met using the assets acquired, the sellers were entitled to more than $16,725,000. Also, both sides agreed to the concept that merging or consolidating the business or assets before the earn-out period expired could unfairly interfere with the sellers’ chance to earn the earn-out payment. There is no penalty here.
The Court thus finds itself staring again at the Appeals Court decision in President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 895-96 (2003). The extrinsic evidence provided in the motion papers does not provide the answers needed.

ORDER

For the foregoing reasons, the Plaintiffs’ Motion for Summary Judgment, Paper #16, and the Defendants’ Motion for Summary Judgment, Paper #20, are each DENIED.

Nhe Court observes that Section 10.13.2(b) provides that each party “irrevocably and unconditionally waives any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of or relating to this agreement or the transactions contemplated hereby.”