van Gestel, Allan, J.

FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

This matter is before the Court after a juiy-waived trial on the merits[3] for findings of fact, rulings of law and an order for judgment. What is involved is the *251 interpretation of an earn-out provision in an asset purchase agreement.

FINDINGS OF FACT

Instrument Industries, Inc. d/b/a New England Affiliated Technologies, (hereafter “NEAT”), sold most of its assets and some of its liabilities to the defendant Kollmorgen Corporation (“Kollmorgen”) pursuant to an Asset Purchase and Sale Agreement (the "Agreement”) dated as of April 21, 1999. The plaintiff, Instrument Industries Trust (the “Trust”), was also a party to the Agreement. The detailed Agreement is spread over 65 pages of single-spaced type and includes 282 additional pages of exhibits.
The Agreement is to “be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts . . .”
The parties to the Agreement are sophisticated concerning the subject matter thereof and were represented by competent counsel in its drafting and execution.
The purchase price was “$16,725,000 plus any earn-out payments made pursuant to Section 2.5" of the Agreement. It is one aspect of the earn-out payments provision that is in issue in this case. It is in Section 2.5.4, which reads as follows:
From and after the Closing Date, nothing herein shall prohibit Buyer, or vitiate any rights of the Buyer, to sell all or any part of the Assets or the Business to any third party, provided that if at any time prior to March 31,2002 (i) the Business is sold, (ii) all or substantially all of the Assets are sold to any third party, (iii) all or any portion of the Business is merged or consolidated without Seller’s written consent, or (iv) Mr. McCarthy or Mr. Petersen are terminated without cause . . . then within thirty (30) days after such event Buyer shall cause to be delivered to Seller by bank wire transfer to Seller’s Account ... an amount equal to the discounted present value of the remaining maximum earn out amount payable pursuant to Section 2.5 .. .
The “Business” is defined in the first WHEREAS clause as “the business of manufacturing and selling precision machined motion control systems.”
The “Assets” are referred to in Section 1.1 as “all of Seller’s right, title and interest in and to all of the assets, properties, rights and contracts used in or relating to the Business wherever located, other than” certain excluded assets.
In general, what was included among the assets to be acquired were: equipment, inventory, receivables, certain rights, contracts, leases, equipment leases, business records, computer software, patents and technology, trademarks and copyrights, permits, prepaid charges, claims, insurance proceeds, cash, welfare plans and personal property. What was excluded were: tax refunds, completed or closed contracts, some employee loans and a Ford automobile listed on a schedule attached to the Agreement, the Seller’s rights under the Agreement, the Seller’s corporate records, and assets and rights under employee pension and benefit plans.
Kollmorgen subsequently was acquired by the defendant Danaher Corporation (“Danaher”). NEAT thereafter became a part of Danaher Precision Systems (“DPS”). “Danaher Precision Systems" was simply a name affixed to a portion of Danaher’s business and was not a legal entity as such. NEAT operated as a Danaher division or part of a division, rather than as a separate corporate or other entity. The parties are in disagreement as to the degree to which NEAT was operated as a stand-alone division.
Three events occurred which are at the heart of the present dispute.
First, although NEAT made its target for earn-out payments for the first two years, and received $2,000,000 therefor, it failed to do so in the third year.
Second, Danaher brought in one of its European subsidiaries, a small German corporation named Cleveland Precision Systems (“CPS”), and CPS operated in conjunction with NEAT.
Third, in a bankruptcy sale in March of 2002, Danaher acquired the assets of another company named IDC and began utilizing those acquired assets in the NEAT/CPS operation.
The Trust argues that the actions taken by Danaher with regard to CPS and IDC, as related to the NEAT operation, resulted in a merger or consolidation of the Business conveyed by the Agreement, thus triggering a significant earn-out payment. Danaher argues that the words “merger” and “consolidation” have recognized meanings in the business world, and that what occurred with CPS and IDC was neither a merger nor a consolidation.
In consideration of cross motions for summary judgment, the Court found sufficient ambiguity to warrant denial of the motions and to proceed with this trial [19 Mass. L. Rptr. 27). At that time, among other things, the Court said:
It seems obvious that in order for the earn-out provisions to be fair to both NEAT and Danaher, the assets and the use of those assets acquired from NEAT should be kept and used without any significant addition or subtraction of or to those assets during the earn-out period. If the assets are used in the business of the division, the division should stand sufficiently alone as to enable a fair measure of whether the earn-out payment was due. Whether, and to what extent, that did or did not happen cannot be resolved on either of the cross motions before the Court. But that resolution may provide the Court with the information necessary to provide an interpretation of Section 2.5.4(iii) which is reasonable in the circumstances.
*252 As stated above, Kollmorgen was acquired by Danaher a short time after the closing of the Agreement with NEAT. Nothing was presented at trial to demonstrate that the Danaher acquisition of Kollmorgen had any effect on the assets or the business being operated by the NEAT “division.” In fact, it does not appear that the Danaher acquisition, in and of itself, led to any immediate changes for NEAT.
Further, both Mr. McCarthy and Mr. Petersen remained with Kollmorgen after the sale and were not terminated involuntarily. Although Mr. Petersen left in July of 1999, his leaving was a voluntary act, not a termination.
When Roger F. Roach (“Roach”), president of Instrument Industries, Inc., first claimed that Danaher’s acquisition of Kollmorgen triggered the earn-out, Kollmorgen, in a May 30, 2000 letter from its Vice President, Secretary and General Counsel, responded, rejecting the claim. The letter to Roach said:
As you know, the intent and purpose of this section [Section 2.5.4 of the Agreement] was to protect the Seller’s ability to achieve the Earn Out by prohibiting the Buyer from selling the Business or the Assets of Neat or merging or consolidating the Business. The concern that the Seller expressed and what the Agreement (including Schedule 2.5.1) provides for is that the Buyer will continue to conduct the Business as a standalone operation through March 31, 2002.
The acquisition by Danaher of IDC, as noted above, came out of a purchase of IDC’s assets out of bankruptcy. The planning for this event did not begin until February of 2002. Further, IDC’s assets, and the operation of its business, which was located in California, continued until early in April of 2002, shortly after the earn-out period expired. The IDC assets were not actually moved from California to Salem, New Hampshire until April of 2002.
The NEAT division at Danaher eventually evolved into and was called “Danaher Precision Systems.” It remained as a division and never became a separate corporate entity.
Sometime a few months after the Danaher acquisition of Kollmorgen, issues arose about Danaher’s German subsidiary CPS. CPS was, at best, a sleepy, poorly run, company with an oversized staff and an excessive number of employees for the limited business it was doing. Further, CPS’s inventory heavily included older, less attractive components. CPS’s financial condition was deteriorating. Its sales were at unacceptable levels and getting worse. For these reasons, in June of 2001, Danaher concluded that there were three possible alternatives for CPS’s future: restructure it and use it as a platform for DPS Europe; sell the business; or close CPS. CPS was described as “a time and money sink [thatl should be divested while it still has some limited value.” (Exhibit 32.)
Despite the foregoing, it was ultimately determined by Danaher that because of some — albeit limited— similarities in the CPS business and that of NEAT, the two could in some ways be operated together. More importantly, CPS’s location in Germany could be used by NEAT to promote a direct European connection and thereby expand NEAT’s business in the European market.
The June of 2001 examination of CPS by Danaher Precision Systems’ General Manager, Jeffrey Beck, caused him to conclude that there should be a layoff of a number of its employees. This, however, turned out to be not capable of being accomplished because of highly protective German labor laws. Consequently, Danaher set about effecting reductions in NEATs employees. These reductions had an effect on NEATs business, particularly in the need to extend lead times to respond to customers’ requests.
For a short time, NEAT was directed to source and acquire parts from CPS. The parts provided, however, were of unacceptable quality, and NEAT resumed the acquisition of parts from its former Japanese source.
There was insufficient evidence presented from which this Court can determine the monetary extent to which the CPS “consolidation” into Danaher Precision Systems affected NEATs ability to meet the third earn-out targets.

RULINGS OF LAW

The Court begins by ruling that the evidence, extrinsic and otherwise, does not warrant a ruling that either the acquisition of Kollmorgen by Danaher or the acquisition of the assets of IDC produced triggering events for the third earn-out provision in the Agreement. Thus, the focus must apply to the CPS transactions.
As it did on the cross motions for summary judgment, the Court will first examine the extrinsic evidence presented in the contract and related documents.
“The terms stated by the parties will be taken in their plain and ordinary sense unless otherwise indicated in the contract.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Although the Table of Contents to the Agreement contains a Definitions section which includes citations to definitions of 106 different words, phrases and acronyms, nowhere among them is there any definition for either of the words “merger” or “consolidate.” Thus, ordinary dictionary definitions will have to suffice.
“Merger” is defined in Black’s Law Dictionary, Sixth Edition, as: “The fusion or absorption of one thing or right into another; generally spoken of as a case where one of the subjects is of less dignify or importance than the other. Here the less important ceases to have an independent existence.”
“Consolidate” is defined in Black’s Law Dictionary, Sixth Edition, as: “In a general sense, to unite or unify *253 into one mass or body, as to consolidate several small school districts into a large district, or to consolidate various funds. In legislative usage, to consolidate two bills is to unite them into one. The term means something more than to rearrange or re-divide.”
Danaher argues that the Court should apply more formal usage of the words “merger” and “consolidate” such as is used in the corporate sense. In that sense, there was no merger or consolidation. But here, as observed before, the Agreement is not dealing with a corporation. What the “Business” is, is the use and application of assets acquired from a corporation, here known as NEAT, which assets were purchased by Danaher’s predecessor Kollmorgen.
It is not possible to fuse, absorb, unite or unify the assets of NEAT with the corporate entity of CPS. What would have to happen is for CPS to acquire the assets of NEAT or to have Danaher acquire the assets of CPS and unite or unify those assets of NEAT. What happened was that the businesses of CPS and NEAT were to some extent and in some manner brought together in a way that had an effect on NEAT.
The Court observes that the Agreement, in Section 2.5.4(iii), calls for the merger or consolidation of “all or any portion of the Business.” (Emphasis added.) If not all, how large a portion of NEATs or CPS’s assets is enough to satisfy this provision? In the instance here, how much of NEATs or CPS’s assets actually were fused, absorbed, united or unified, and how did that come about?
Section 2.5.4 is entitled “Sale of Assets or Business,” and the text of the Section speaks of selling “all or any part of the Assets or Business to any third party.” This seems to suggest there is a difference between the “assets” and the “business.”
The definitions for the “Business” and for the “Assets” quoted above seem to draw a similar distinction. The assets are the things which are used in “the business of manufacturing and selling precision machined motion control systems.” This use of the word “business” leads the Court back to Black’s Law Dictionary. The definition of “business” there is: “Employment, occupation, profession, or commercial activity engaged in for gain or livelihood . . . Enterprise in which a person engaged shows willingness to invest time and capital on future outcome . . . That which habitually busies or occupies or engages the time, attention, labor, and effort of persons as a principal serious concern or interest of for livelihood or profit.”
Further, the Court observes that there is a difference in the language of Section 2.5.4(ii), which speaks of “all or substantially all” of the Assets being sold to any third party, and (iii) which speaks of “all or any” portion of the Business being merged or consolidated. This was not inadvertent. In Exhibit 21, an earlier draft of Section 2.5.4, subsection (ii) spoke of“all or any part” of theAssets being sold. “Any part” was deleted, and “substantially all” was substituted therefor. Thus, this Court must consider that the parties, when they used the word “any” in subsection (iii), intended something different than “substantially all” as used in subsection (ii).
The phrase “all or substantially all” is not new in the corporate sense when dealing with the disposition of assets. It appears most recently in the Massachusetts Business Corporation Act, G.L.c. 156D, sec. 12.01,[4] which deals, among other things, with the sale of corporate assets. Comment 1 to sec. 12.01 reads as follows:
The phrase “all or substantially all,” chosen by the draftsmen of the Act, is intended to mean what it literally says, “all or substantially all.” The phrase “substantially all” is synonymous with “nearly all” and was added merely to make it clear that the statutory requirements could not be avoided by retention of some minimal or nominal residue of the original assets. A sale of all the corporate assets other than cash or cash equivalents is normally the sale of “all or substantially all” of the corporation’s property. A sale of several distinct manufacturing lines while retaining one or more lines is normally not a sale of “all or substantially all” even though the lines being sold are substantial and include a significant fraction of the corporation’s former business. If the lines retained are viewed only as a temporary operation or as a pretext to avoid the “all or substantially all” requirements, however, the statutory requirements of chapter 12 must be complied with. Similarly, a sale of a plant but retention of operating assets (e.g., machinery and equipment), accounts receivable, good will, and the like with a view toward continuing the operation at another location is not a sale of “all or substantially all” the corporation’s property.
A recent Delaware Chancery Court decision provides similar guidance.
“All” means “all,” or if that is not dear, all, when used before a plural noun such as “assets,” means “(t]he entire or unabated amount or quantity of, the whole extent, substance, or compass of, the whole.” “Substantially” is the adverb form of “substantial.” Among other things, substantial means “being large but not wholly that which is specified.” “Substantially” conveys the same meaning as “considerably” and “essentially” because it means “to a great extent or degree” and communicates that it is very nearly the same thing as the noun it acts upon. In all their relevant meanings, substantial and substantially convey the idea of amplitude, or something that is “(c)onsiderable in importance, value, degree, amount, or extent.” A fair and succinct equivalent to the term “substantially all” would therefore be “essentially everything.”
Hollinger, Inc. v. Hollinger Intern., Inc., 858 A.2d 342, 377 (Del.Ch. 2004).
In the context of determining whether there was a de facto merger of one corporation into another, the Supreme Judicial Court concluded that a sale that “in- *254 eluded customer lists; customer contracts; furniture, fixtures and furnishings; service parts, equipment, and service supplies; trademarks; trade names; service marks; licenses and logos; contracts; agreements and leases; automotive equipment and motor vehicles; leasehold interest; goodwill; and certain prepaid expenses and all business and other books, papers, flies, and records, with certain exceptions” constituted a sale of “substantially all” of the corporation’s assets. Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. 356, 358 n.5 (1997). The Cargillsale is not dissimilar from the sale of NEATs assets here.
The word “any,” however, is definitely different from the words “substantially all.” It certainly does not mean or imply “nearly all.” Rather, it suggests far less than all; more in the nature of “something,” without any implication that the “something” be of any particular quantity.
What was intended by the earn-out provision was an agreed-upon method — between sophisticated businessmen, advised by sophisticated counsel — to address an element of the purchase price in a way that bridged the parties’ differences in view of the value of the assets being sold. Both sides agreed that if certain profit targets were met using the assets acquired, the sellers were entitled to more than $16,725,000. Also, both sides agreed to the concept that any merging or consolidating the business or assets before the eam-out period expired could unfairly interfere with the sellers’ chance to earn the eamout payment. Implicit in this understanding was the fact that measurement of any interference was very difficult. Thus, the only sure way to accomplish the intended task was to insure that NEAT remained, to the end of the eam-out period, a stand-alone entity.
This Court concludes, and rules, that the formal definition of the words “merger” and “consolidate” should not be applied to the Agreement in issue. Then, the words “all or any portion of the Business is merged or consolidated without Seller’s written consent,” must be used as the template to consider the CPS situation.
This Court further finds and mies that the CPS situation did constitute the “fusion or absorption of one thing or right into another,” when applying the less formal non-corporate definition of the words “merger” or “consolidate.”
The Court still further finds and mies that the CPS situation resulted, in a general sense, in the “unitfingj or unification] into one mass or body” of the assets of NEAT and CPS, when applying the less formal non-corporate definition of the word “consolidate.” What happened interfered with NEATs stand-alone ability to achieve its target.
The Court then refers to the parties’ conscious use of the phrase “all or any portion of the Business” (emphasis added), as the modifier of “merger” or “consolidate.” Certainly not “all” of the assets of NEAT and CPS were fused or united. But equally certainly, something more than an infinitesimal amount of the assets of those businesses were fused or united. And since the dictionary definition of “any” includes “a or some no matter how great or small — used as a function word to indicate what is considered despite its quantity or extent,” Webster’s New International Dictionary, this Court mies that the earn-out was triggered by “any portion of the Business [of NEAT being] . . . merged or consolidated [with CPS] without [NEAT]’s written consent prior to March 31, 2002.”
The complaint contains five separate counts, as follows: Count I for declaratory judgment; Count II for breach of contract (Sections 2.5.4 and 10.9); Count III for breach of contract (Section 2.5.1); Count IV for violation of G.L.c. 93A; and Count V for breach of implied covenants.
Based upon the findings and rulings above, this Court mies in the plaintiffs’ favor on Count I for declaratory relief and on Count II for breach of Section 2.5.4 of the Agreement. CountV, seeking relief for the breaches of implied covenants in the Agreement, is effectively the same as Count II.
Count III seeks a ruling that there is a breach of Section 2.5.1 of the Agreement. Section 2.5.1 relates to the first year eam-out. That earn-out was paid. There is, therefore, no breach of Count III.
Count IV is the ubiquitous c. 93A claim that appears so frequently in complaints before this Court. As to this claim, the Court finds and mies that it was not proven. To bring such a claim, there must be activity that constituted unfair or deceptive practices. “[A] practice or act will be unfair under G.L.c. 93A, sec. 2, if it is (1) within the penumbra of a common-law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscmpulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys 'R' Us, Inc., Massachusetts, 441 Mass. 451, 457 (2004). See also Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 27 (1997); Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). There is, however, no binding definition of what constitutes an unfair practice under c. 93A. The existence of unfair acts and practices must be determined from the circumstances of each case. Green v. Blue Cross & Blue Shield of Massachusetts, Inc., 47 Mass.App.Ct. 443, 447 (1999).
At most, here, there was a fairly contested group of issues between the parties over factual situations that may have resulted in the triggering of an earn-out provision in a contract. These are claims in the nature of breach of contract; but a mere breach of contract alone is not enough to make out a c. 93A claim. Madan v. Royal Indemnity Co., 26 Mass.App.Ct. 756, 764 (1989). There was no extortionate quality to the defendants’ actions here. This dispute does not demonstrate a c. 93A violation. See, e.g., Community Builders, Inc. v. Indian Motorcycle Assocs., Inc., 44 Mass.App.Ct. 537, 559 (1998).

*255
ORDER FOR JUDGMENT

A declaratory judgment shall enter in favor of the plaintiffs on Count I as follows:
Prior to March 31, 2002, a portion of the business of Instrument Industries, Inc. of manufacturing and selling precision machined motion control systems was merged or consolidated without the written consent of Instrument Industries, Inc., thereby triggering the payment of an amount equal to the then discounted present value of the remaining maximum earn out amount payable pursuant to Section 2.5 of the Asset Purchase and Sale Agreement in issue in this case. Such payment should have been made no later than thirty (30) days after March 31, 2002.
Further, upon determining the amount equal to the then discounted present value of the remaining maximum earn out amount payable pursuant to Section 2.5 of the Asset Purchase and Sale Agreement in issue in this case as of April 30, 2002, judgment in the amount so determined shall enter in the plaintiffs’ favor on Count II, together with costs and statutory interest from April 30, 2002.
All other counts of the complaint shall be dismissed.

 Section 10.13.2(b) of the Agreement in issue provides that each party “irrevocably and unconditionally waives any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of or relating to this agreement or the transactions contemplated hereby.”

 The Court is cognizant of the fact that the new Massachusetts Business Corporation Act was not in effect until July 1, 2004, long after the matters in issue here. Nevertheless, the phrase used was not unfamiliar to business lawyers, and the definition in the Comment is helpful.